## Thomas et al. *v.* Ellmaker et al.

Where the answer of a defendant has not been excepted to, and the case is set down by the plaintiff on bill and answer, the answer is to be taken as true in all points.

A voluntary association of individuals who have contributed funds for a public purpose, will be regarded as a charity, and a Court of Equity in this state has jurisdiction over the parties. Funds supplied by the gift of the Crown, or from the legislature, or from private gift, for legal, general, or public purposes, are charitable funds, to be administered by a Court of Equity.

Money given for a fire-engine, or hose company, either by will or the gift and contribution of individuals, is a charity, over which a Court of Equity can exercise control.

The statute of 43 Elizabeth, in relation to charities, is not in force in Pennsylvania; yet a common law, analogous in its results to those of the statute, exists in this state, by which such subjects are placed under legal control and protection. So cases constructively within the statute are of a public nature, tending to the relief of the public at large: and even when they are not corporations; for equity supports the uses without them; and although they are not incorporated bodies in the proper sense of the term, but resemble them in this, that their trusts are of a public character, and are specially recognised and provided for by the laws of the Commonwealth.

A fire association, formed for general and public usefulness, where there is no individual emolument or advantage, is a charity over which a Court of Equity can exercise its jurisdiction, under the 13th section of the Act of 1836, which gives the Supreme Court and the Court of Common Pleas of Philadelphia, sitting in equity, jurisdiction over an association of individuals formed for a public purpose, who received money from the public as by gift, although an unincorporated association or society.

Such an unincorporated association is not a partnership as between themselves, whatever may be its relation as to third persons.

Where the association is for *private* and individual profit or pleasure, with no public object, it is treated as a copartnership. So, where the association is for private emolument, or for benevolence, confined exclusively to the associates, and in which none others participate, as between themselves, they are partners.

But a private unincorporated association for general purposes of public utility, a Court of Equity will not treat as a partnership, nor declare its dissolution and divide its assets among the members composing it; especially on the application of a minority.

Property given to such an association is pledged to the objects for which it was intended to be applied by the successive contributors, and cannot be diverted from them while those remain who are ready and willing to execute the public trust with which it has been clothed. In such private associations the majority cannot bind the minority unless by special agreement. Nor will a Court of Equity suffer its funds to be diverted to other uses than the donors intended.

If an individual is unjustly, and without reasonable cause, deprived of his membership in an unincorporated association, regarded as a charity, he is not without his remedy in a Court of Equity. And his only relief is by application to that tribunal, for he has none in a Court of Law. He should apply specifically for his restoration. Where such relief is not specially asked for in a bill, it will not be granted under the general prayer.

The rule on the subject is this: that although, where the prayer does not extend to embrace all the relief to which the plaintiff may at the hearing show a right, the deficient relief may be supplied under the general prayer; yet such relief must be consistent with that specifically prayed, as well as with the case made by the bill. A specific prayer for the dissolution of an association, and an account and division of its assets, is not consistent with a decree for a restoration to membership.

*May* 6. THIS case arose on a bill in equity filed by Samuel B. Thomas and twenty-four others, against Peter C. Ellmaker and ten others, specially named, and referring to a certain schedule containing the names of nearly one hundred other individuals, embraced in said schedule attached to the bill, which it was prayed the Court would make parties to the bill, in case it should be thought fit; alleging that all were associated together as members of an unincorporated association, under the name and title of " The Phœnix Hose Company," and that the complainants, in connexion with the defendants and those mentioned in the schedule, signed an article of association in the following words:—" We, the undersigned, being well convinced of the great utility to be derived from well regulated hose companies in times of fire, and being desirous to render our assistance in order to preserve the property of our fellow citizens from the ravages of that destructive element, have formed ourselves into an association under the name and title of ' The Phœnix Hose Company,' and for the good government thereof have adopted a constitution and by-laws, for the support of which we mutually pledge ourselves;" and the bill averred, that, in conformity with said article of association, a constitution and by-laws were adopted, a copy of which was attached to the bill, and a prayer that they should be considered a part thereof.

The complainants then set forth, that, for many years previous, they, in connexion with the defendants, and those mentioned in the schedule, had been members of said association, and enjoyed all the rights and privileges of membership, and as such became possessed of a large amount of real and personal property, a description whereof was given in a schedule attached to the bill, and to be considered a part of the same, besides contributing large sums of money for the support and enriching said association; also averring, that the complainants, at all times, had properly conducted and demeaned themselves as members of said association, and never committed any act to render themselves liable to be justly expelled under the constitution and by-laws thereof.

The complainants then complained that the defendants, with other persons unknown to the plaintiffs, did unjustly and illegally

enter into a combination to expel them from their membership in said association, and to deprive them of all their rights and property therein, without any just cause or legal proceeding, and the said defendants, in pursuance and execution of said combination, did secretly and unlawfully conspire and agree, that they, the said Ellmaker and the other defendants, as members of the said association, to vote with, and assist in the expulsion of the complainants from said association, and that in pursuance of the said combination and agreement, the aforesaid persons, parties defendants in said bill, were nominated before an electing committee of the said association held in an unusual manner, and without legal or timely notice having been given to all the members of the convening thereof, but that due and timely notice and knowledge of the convening of the said committee was purposely delayed and withheld from Wallace Fassitt, one of the complainants, and a member of said committee.

The bill further stated, that, in pursuance of said combination and agreement, a special meeting of the said association was called, under the direction of the President, Peter C. Ellmaker, one of the defendants, and at the request of the others, naming them, and the time when called, of which due and legal notice was not given to the complainants, of the convening thereof, according to the by-laws of the association.

The complainants also averred, that, at the meeting thus illegally held at the time mentioned, the said defendants and others, in further pursuance of the said combination and agreement, and notwithstanding the protest of said Fassitt, one of the members of the electing committee, stating that he had not received due and timely notice of the meeting of said committee, and was thereby prevented from attending and exercising his right as a member of the same, did proceed to the election of said other ten defendants named in the bill, and did elect them members of said association; and that, after the election of the persons so illegally made, and at the meeting so illegally held without due notice having been given, in pursuance of the said illegal combination and agreement, Peter C. Ellmaker, president of the said association, and one of the said defendants, without having given any notice or intimation to the complainants, read and proposed a certain preamble and resolutions, a copy of which was annexed to the bill, illegally and unjustly expelling the said complainants from their membership in said association, which said preamble and resolutions, with the

assistance of the aforesaid illegally elected members, were passed. And that the said resolutions were so cunningly devised and framed, that they include the names of all the complainants, and were passed upon one and the same vote, and thereby, the complainants were deprived of their right of voting thereon, and protecting each other in the legal enjoyment of their rights and property.

The bill then averred that the defendants pretended that the electing committee were not irregularly convened, and that said meeting was not illegal, and that the said complainants were not illegally expelled from being members of said association, but that they were legally expelled from said association, and that they will not permit the complainants to act and enjoy their rights and property as members of said association, and that the defendants threaten and intend to apply the property of the association as they see fit, without consulting or permitting the complainants to exercise their just rights or control over the same. And that the defendants pretend and allege that they, with certain others named, are exclusively members of said association, and have refused the complainants their rights as members thereof, and their property therein, and threatened to elect divers other members of said association, and do refuse the complainants their right to participate in said election, and deny them the right of voting thereon, and on all matters relating to the interests of said association.

The bill then prayed that the defendants might be required to answer twenty-four interrogatories specially put; and concluded with a prayer that an account be taken of all the property of the association, and of all money paid out or received since the pretended expulsion. Also for the appointment of a receiver, and a decree of the dissolution of the association, and that the property might be distributed among the persons legally entitled thereto. There was also a prayer for an injunction, and one of general relief.

There was an answer filed, denying the combination charged in the bill, and asserting that due notice was given of the time of the meeting of the association to the plaintiffs and other members thereof; alleging the legality of their election, and admitting the expulsion of the complainants; and asserting that it was by a vote of two-thirds of the members present; that the complainants were present at the meeting, and had an opportunity of defending themselves, &c. Other matters were stated in the answer, which are not deemed material to understand the opinion of the Court.

The cause was heard on bill and answer, and was argued by Mr. *Thomas* and Mr. *Meredith* for plaintiffs, and Mr. *Page* and Mr. *Dallas* for defendants.

Mr. *Page* contended that the Court of Common Pleas had no jurisdiction under the Act of 1836, nor by the Act of 1840.  That an unincorporated company was no partnership.  That no account was prayed for in the bill.

2. That all the parties interested were not introduced into the bill, which ought to have deen done: cited Calvert on Parties, 117, 118, 150.

3. It cannot be regarded as a trust.  That a trust was a confidence reposed in another by the act of the party or the act of the law.  That the only ground on which a Court of Equity could claim cognisance of the parties would be, that it was a partnership.  But it was not such, and did not come within the definition of a partnership: cited 5 Watts, 350, 360; Cary on Part. 80; 4 Vesey, 756; 5 Id. 322; 1 Vesey & B. 154; 2 Atk. 296; 6 Watts, 306.

4. That there was an ample remedy at law; that a Court of Equity would not interfere with the concerns of a partnership like this, if it was one.

That upon the facts set forth in the bill, the expulsion of the members was in accordance with the by-laws, rules, and regulations of the company, and was perfectly legal and proper.  That notice was given to those expelled of the action of the committee.

Mr. *Thomas*, for plaintiffs, contended that the Court had jurisdiction under the Acts giving equity jurisdiction, even although it should not be regarded as a partnership: cited 3 Vesey & Beames, 180; Berry v. Dix, 1 Con. 213; 2 Vesey & Beames, Waters v. Taylor, 3 Vesey, 74; 15 Ib. 10; 1 Swanston, 48; 1 Story's Eq. 622; 5 Whart. 520.

If the act complained of is illegal, the Court have the right to grant an injunction, and there were sufficient parties for that: 16 Vesey, 326; Mayor v. Malachi, 1 Maline & Craig, 529.

3. The manner in which the expulsion was effected was illegal; the plaintiffs had no notice of the charges against them: 1 Black. 485; 1 Salk. 174.  On the question of jurisdiction was also cited 3 P. W. 511; 1 Vesey, Jr., 130; 4 Madd. 143; 2 Jacob & Walker, 503; 9 Wend. 400; 5 Wharton, 506; 3 Atkins, 385; 2 Vesey, 629, 630; 1 Simons, 8; 14 Vesey, 245; 2 Simons, 386; 1 Keene, 24; 4 Johnson C. R. 373; 1 Jacob, 537.

Mr. *Meredith*, on the same side, contended, that it was clear the Court had jurisdiction. It was an unincorporated company—a partnership—a combination of individuals for a joint purpose, and was embraced within the law of partnerships. Such companies were within the view of the legislature when the equity authority was conferred upon this Court.

The agreement was a mere private one. This was a case for the specific action of a Court of Equity, and here equity interposes. Whenever one partner is unjustly excluded from his rights, equity restores him. An injunction will be granted, when necessary, to restrain others from illegal and improper action, and the Court will give full and perfect relief.

He contended the Court had a clear right to restore the members that were expelled; and also the right to dissolve the association, and require an account and distribution of the assets of the company.

Further, as they had a right, the remedy was a decree to restore them to what they had been deprived of by the illegal acts of the majority, who had excluded them.

Mr. *Dallas*, in reply, contended that an injunction could not issue, and it was wrong; that his clients should not be enjoined from proceeding in the exercise of their rights and functions.

1. The Court had no jurisdiction for the purposes asked for in this bill. That the facts ascertained from the bill and answer did not make a case that would warrant the interference of the Court.

The source from whence the Court derived their jurisdiction was from the Act of 1836. That the character of the defendants, and relations in which they stood to the plaintiffs, did not give jurisdiction. The Court could not dissolve the association; such a power could not be claimed from the Act of 1836.

He further contended that there was a remedy at law, if members were ejected, arising from the nature and character of the association.

It was also argued these were not proper parties before the Court: all had not been introduced into the bill. It was also contended that the expulsion of the plaintiffs was legal, and in accordance with the articles of association.

The opinion of the Court was delivered by

KING, President.—This case, as disclosed by the bill, exhibits, and answers, is in substance as follows : The plaintiffs, ten, and the

defendants, eighteen in number, and others, were members of a "fire hose association in Philadelphia," known since the year 1817 as the "Phœnix Hose Company." This association was never incorporated, but existed under a constitution and by-laws framed for their better government, and subscribed by each person becoming a member. The preamble to the constitution and by-laws declares that the associates, "being well convinced of the great utility to be derived from well regulated hose companies in time of fire, and being desirous to render assistance in order to preserve the property of their fellow-citizens from the ravages of that destructive element, had formed themselves into an association under the name and title of the 'Phœnix Hose Company,' and for the good government thereof, had adopted a constitution and by-laws; for the support of which they mutually pledged themselves." This association has continued in harmonious action until the controversy which has given rise to these proceedings. During this time, a large fund has accumulated from the voluntary subscriptions of the members, which has been invested in a house and lot for the reception of their apparatus and hose, and other appliances required for the objects of the association. For the better understanding of the case, it becomes necessary here to recur to a portion of the constitution and by-laws, which are alleged by the complainants to have been infracted by the defendants, and which infraction forms the basis of the relief asked by complainants in their bill. By the fourth section of the constitution it is declared, that "no member shall be elected or expelled without the concurrence of two-thirds of those present," and that "no member shall be expelled without having an opportunity to defend himself." By the fourth section of the fourth by-law, it is made the duty of the secretary to "have notices served on all the members, at least twelve hours previous to every meeting, designating those at which amendments to the constitution or by-laws are to be determined upon." Among the officials contemplated by the constitution, is an electing committee of five members, chosen semi-annually. By the first section of the first by-law, "any person wishing to become a member, shall be proposed in writing to the electing committee, who, should they deem him eligible, shall report him at the next meeting of the company, when he may be elected." The stated meetings of the society are to be held the first Thursday of every month; but special meetings may be called at any time at the request of six members, by direction of the president.

The bill proceeds to charge that the defendants entered into a combination to expel the complainants from membership in the association, and to deprive them of all rights therein; and that, in pursuance of this combination, the first ten named defendants did secretly conspire and agree that they would procure the election of the other eight defendants as members of the association, to vote and assist them in the expulsion of the complainants. That in pursuance of such combination, the last-mentioned eight defendants were nominated before an electing committee at a meeting held in an unusual and sudden manner, and without due notice given to all the members thereof; but that such notice was purposely delayed and held from Wallace Fassitt, one of the members of said committee. The bill proceeds to charge that afterwards and in pursuance of the combination, a special meeting was called under the direction of Peter C. Ellmaker, the president of the association, at the request of six of the defendants, for the evening of the 14th of April, 1843, at 8 o'clock, of which meeting due notice twelve hours previous to the convening thereof was not given to the plaintiffs; that, at the special meeting so held, the first ten named defendants *and others*, members of the association, in further pursuance of the combination charged, and against the protest of Fassitt, that he had not received due notice of the meeting of the electing committee, proceeded to the election of, and did elect, the said last-mentioned defendants members of the association. That then P. C. Ellmaker, without any previous notice or intimation to the plaintiffs, proposed a preamble and resolutions, illegally and unjustly expelling the plaintiffs from the association; which preamble and resolutions, with the assistance of the eight illegally elected members, were passed, being so cunningly devised and framed, that they included the names of all the plaintiffs, and were adopted by one and the same vote; thereby depriving the plaintiffs of their right of voting, and protecting each other in the enjoyment of their rights. The preamble and resolution are annexed as an exhibit to the bill, and are in these words: "Whereas it is necessary for the well-being and prosperity of associated bodies, that union and harmony should exist among the members on all subjects relating to the general good; and whereas, it has been ascertained that a combination now exists among a number of the members of this company, whose object is ultimately to create a dissolution; to effect which, they oppose the election of every person, regardless of character or qualification, who may be recommended for membership, unless they

14

believe the candidate will assist in the accomplishment of their object: And whereas, the company deeming the privilege which belongs to all bodies constituted in like manner, of presenting those of their members who have been guilty of acts which are prejudicial to the interests of the constitution, do

"*Resolve*, That S. J. Christian, S. B. Thomas, Joseph Walker, F. C. Thomas, William C. Conrad, F. A. Eberman, A. V. Gibbs, Pennington Jones, F. R. M'Clure, F. J. Ott, Wallace Fassitt, and Elias G. Cope, having entered into a conspiracy to prevent the election of members, and ultimately effect a dissolution of this company, are now no longer worthy of membership.

"*Resolved*, That the said S. J. Christian, &c., be and are hereby expelled from this company."

After the usual allegations of pretences, interrogatories to be answered, and other formal parts, the bill proceeds, first, to pray answers from the defendants; second, that an account may be taken of all and every part of the property and effects of the association at the time of the pretended expulsion of the defendants, and an account of all moneys received and paid since; third, that a receiver be appointed to take possession and charge of all property and effects of said association, and protect the same from injury and waste; fourth, that the Court decree a dissolution of the association, and a distribution of the property between such persons as may be legally entitled thereunto; fifth, that an injunction *ad interim* be granted, restraining the defendants from intermeddling with the property, from electing new members, or doing any act or thing affecting the association, or the rights of the plaintiffs; and finally, for general relief.

The answers of the defendants admit the existence of the association as charged in the bill, the membership of the plaintiffs previous to the 14th of April, 1843; that the association was held under the constitution and by-laws stated in the bill, and that the associates held, owned, and possessed, the real and personal estates alleged by the plaintiffs. But the answer distinctly denies the combinations charged, and asserts that due notice was given of the time of the meeting of the association to the plaintiffs and others, members thereof, which resulted in the largest meeting of the association ever assembled; that due notice of the meeting of the electing committee was served at the residence of Wallace Fassitt, the dissenting member; that such meeting was not held in a sudden and unusual manner, but called according to the usual mode of

convening the committee; that the committee in the established form reported in favour of admitting as members, the parties alleged by the bill to have been irregularly introduced; and that, although Wallace Fassitt did object to the reception of the report of the committee in favour of admitting the disputed members, on the ground of a want of due notice to him, yet that such objection was overruled, and the persons reported favourably upon, were duly elected members of the association, and thereupon entered upon the duties thereof. The answer then proceeds to admit the expulsion of the plaintiffs in the manner and for the causes set forth in the bill; and avers that such expulsion was determined upon by the votes of two-thirds of the members present; that the plaintiffs were present, and had the constitutional opportunity of defending themselves; that they demanded no further opportunity than was then given to them to make their defence; but, on the contrary, acquiesced in the sufficiency and legality of said opportunity. It is then admitted that the question of expulsion was taken on all the plaintiffs together, and this course is justified from the nature of the accusation, and that the plaintiffs did not deny or dispute the charge. It is further admitted, that neither of the defendants were permitted to vote on the question of the adoption of the resolution for their expulsion; which course is further justified on the ground of parliamentary usage; and the decision of the chair is said to have been acquiesced in and assented to by the plaintiffs.

The answers of the several defendants have not been excepted to, and the case having been set down by the plaintiffs on bill and answers, the answers are to be be taken as true in all points. Brinckenhoff v. Brinckenhoff, 7 Chancery Rep. 217.

The questions raised in the argument, and which we are now called upon to decide, are, first, has this court sitting in equity any jurisdiction over these parties? Second, can we grant the relief prayed for by the complainants under the special prayer? And, if we are of opinion in the negative, have they shown any equity entitling them to aid from us, under their prayer for general relief, according to the settled principles of equity practice and pleading?

After the fullest consideration of the case, I can see no reason to question our jurisdiction over these parties. In England no doubt can exist that such an association would be regarded as a charity over which equity would exercise control. In the Attorney-general v. Heelis, 2 Simons & Stewart, 67, the Vice-Chancellor

says, that "funds supplied from the gift of the Crown, or from the legislature, or from private gift, for legal, general, or public purposes, are charitable funds to be administered by Courts of Equity. It is not material that the particular, public, or general purpose, is not expressed in the statute of Elizabeth; all other legal, general, or public purposes being equally within the equity of the statute." In the case of M'Gill v. Brown, C. C. U. S., which arose under the will of Sarah Zane, one of the disputed bequests was of a sum of money given by the testatrix to the citizens of Winchester, Virginia, for a fire engine and hose. Speaking of this bequest, Judge Baldwin, in his learned and elaborate opinion (page 66 of Report), says, "There appears no adjudication as to a bequest for a fire engine or hose; but there *needs* no argument to prove it as much an object of utility as a sessions house, a town house, &c. We should administer the law of charities in this state with little regard to its principles, in excluding from its protection so laudable an object as this." The authorities to sustain this position might be multiplied, but I regard it as unnecessary, and simply refer the inquirer to the opinion in M'Gill v. Brown, where all the learning on this subject is collated with remarkable industry and accuracy.

Although it has been held in our Supreme Courts that the statute of 43 Elizabeth, under which the English Courts of Chancery in general regulate and control such charities, is not in force in Pennsylvania; yet a common law, analogous in its results to those of the statute, exists in this state, by which such subjects are placed under legal control and protection. "We consider," says Chief Justice Gibson, in Witman v. Lex, "the principles which chancery has adopted in the application of its principles to particular cases, as obtaining here, not indeed by the force of the statute, but as part of our common law; and where the object is defined, and we are not restrained by the inadequacy of the instrument which we are compelled to employ, we give relief nearly, if not altogether to that extent which chancery does in England. And this part of our system has been produced by causes which worked as powerfully here as did those which produced the system of relief that sprang from the statute of charitable uses." "The cases constructively within the statute," says Rogers, Justice, in Babb v. Read, 5 Rawle, 151, "are of a public nature, tending to the relief of the public at large, and even where these are not corporations, for equity supports the uses without them." But, remarks the learned Judge, commenting on the case before him, which was that of a

society of Odd Fellows, "this is not a charity within the statute of Elizabeth, or the common law of Pennsylvania, the benevolence being confined to its own members;" and most correctly, for it wanted the feature of legal, public, and general usefulness, which Sir John Leech, in the Attorney General *v.* Heelis, describes as the peculiar characteristic of those charities which are administered by Courts of Equity. The same doctrine is advanced by Sergeant, Justice, in Unangst *v.* Shortz, 5 Wharton, 519. "The articles of agreement," he observes, "form the fundamental rules and regulations, and are in the nature of a constitution, under which the congregations jointly and  severally enjoy certain temporal and religious rights. This mode of holding real estate in trust for religious societies, and others of a charitable nature, was frequently adopted in Pennsylvania instead of a charter of incorporation. They are not incorporated bodies in the proper sense of the term, but resemble them in this, that their trusts are of a public character, and are specially recognised and provided for by the laws of the Commonwealth." Again, in the Methodist Church *v.* Remington, 1 Watts, 218, the Chief Justice, delivering the opinion of the Court, says, "The decision in Witman *v.* Lex, 17 S. & R. 388, is full to the point, that a trust in favour of an unincorporated religious or charitable society, is an available one." In the same judgment it is remarked by the Court, that "equitable powers in support of charitable uses, seem to be founded rather in necessity and the constitution of the Court, than in the provisions of the statute of Elizabeth." If it were necessary for the decision of this case, that I should hold this association to be one of those charities, which are recognised and sustained by the common law of the state, I should not hesitate in doing so. It possesses all those attributes of general public usefulness, that total absence of all motives of individual emolument and advantage, which are the true indices of distinction between such associations, and those which Courts of Equity, despite of every effort of their originators, have regarded and treated as mere copartnerships. I am aware that the Supreme Court have, under the Act of 1791, authorizing that tribunal to incorporate literary, charitable, or religious associations, decided that such associations as the present are not within the purview of the legislature. Yet this was quite a different question from whether such associations were charities within the common-law jurisdiction exercised in British equity under the statute of 43 Elizabeth. That was a question of legislative intention as expressed in a written law,

K

conferring what had heretofore been legislative powers on a judicial tribunal. The present is a question of mere judicial authority, to be decided from the nature of the jurisdiction possessed by the tribunals, to be ascertained from direct judicial precedents or necessary analogy to them.

If, however, any doubt could exist as to our jurisdiction over this controversy, as arising from our unlimited authority over trusts and trustees, there can be none under the provisions of the Act of 1836. The 13th section of that Act declares that the Supreme Court and the several Courts of Common Pleas shall have the jurisdiction and powers of a Court of Equity, so far as relates *inter alia* to "the supervision and control of all corporations, except those of a municipal character, and unincorporated societies or associations, or partnerships." The section then proceeds to declare, that, "besides the powers and jurisdictions aforesaid," the Supreme Court sitting in banc in this district, and this Court, shall have certain other enumerated powers, embracing nearly the whole range of equity jurisdiction. It is argued, that, because this part of the section, which so enlarges *our* jurisdiction, reiterates some of the previously granted powers, and omits others, that it was intended to deny to the Courts of this district the powers conferred on the other Courts of Common Pleas in such omitted cases. There is no sort of reason why this exception should have been made in this district, but, on the contrary, manifest reasons why it should not. It is here that the authority of the Supreme Court and of this Court over unincorporated associations and societies is most required; and simply because it is here that they are most numerous. To give the Supreme Court and Courts of Common Pleas a peculiar jurisdiction where it is least, and to exclude them where it is most wanted, is an intent which never should be assigned to the legislature, unless inevitable from express enactment. Is this the case here? Assuredly not. The section gives jurisdiction over unincorporated associations and societies, to "The Supreme Court and the several Courts of Common Pleas" without exception; and that part of the section which is supposed to qualify this general grant, purports to enlarge and not qualify the jurisdiction of the Supreme Court sitting in this district, and of the Court of Common Pleas of this county. The supplemental grant of powers to these tribunals is given, "*besides* the powers and jurisdiction aforesaid." The limitation also, if it exists, would extend to the Supreme Court as well as to ourselves, for both are embraced in the same sentence

enlarging our powers; and which, according to the defendants' argument, has an effect so different from enlarging, that it actually qualifies those previously granted. If this construction is adopted, we have the curious anomaly, that the Courts of Common Pleas of all the other counties of the state have a jurisdiction, and that one of the most delicate and difficult characters in equity, which is not possessed by the Supreme Court sitting in banc in Philadelphia. And this, although the Supreme Court has given to it, in the beginning of the section, express jurisdiction over the subject throughout the state; and although that part of the section, charged with producing this incongruous result, purports to give powers "besides" those previously granted. Of the jurisdiction of this Court over "unincorporated associations and societies," I entertain no doubt.

Before proceeding to the inquiry whether the plaintiffs are entitled to the relief prayed for, or any other relief arising from the facts disclosed, it becomes necessary to notice the argument which sought to place this case on the footing of copartnerships: claiming for the members of this association the ordinary remedies administered between partners in Courts of Equity, as to dissolution, account, and division of funds, after payment of debts. From the course of reasoning already adopted, in which our jurisdiction over these parties is asserted on the ground of the association being a charity or an unincorporated association, within the contemplation of the 13th section of the Act of 1836, it follows that I do not regard these parties, as between themselves, as partners. I say as between themselves, for their relation to third persons is a different affair, one not before the Court, and upon which it is not requisite to pass judgment by anticipation. The English Chancery reports are indeed full of cases in which associations for *private* and *individual* profit or pleasure, have been looked upon in no other light than as copartnerships. Thus, in Cullen v. The Duke of Queensbury, 1 Bro. Ch. Ca. 103, a committee of a private association, consisting of sixty persons, were held responsible for goods furnished the club. Lord Thurlow, according to the case as stated by Lord Eldon, 6 Ves. p. 777, declares, "that he would convince these individuals they had no constitution or by-laws." Lloyd v. Loaring, 6 Ves. 773, was a bill filed by three individuals styling themselves chief officers and secretary of a Freemasons' club, setting out part of their constitution and by-laws, by virtue of which the property was vested in the plaintiffs. The society had agreed to dissolve and join

another, and the defendant, a member, being dissatisfied with the arrangement, carried off the property, books, &c., of the club. The relief asked was a redelivery of the abstracted property. On an objection to the bill for want of parties, leave was given to amend, by striking out all that portion of the bill which assumed a corporate character, and to continue the suit as one brought by the plaintiffs on behalf of themselves and others, partners. Throughout his whole judgment, Lord Eldon regards the parties only as partners, refusing in any way to recognise them in a corporate capacity; declaring it to be the bounden duty of courts of justice not to permit persons not incorporated, to affect to treat themselves as a corporation on the record. Pearce v. Piper, 17 Ves. 1, was the case of a voluntary association for granting annuities to widows; Cockburn v. Thompson, 16 Ves. 321, that of a philanthropic annuity association; Beaumont v. Meredith, 2 Ves. & Beames, 180, that of a society for the relief of its members in sickness. All these were treated and regarded by Lord Eldon as partners. It was the same principles that produced the decision of the Supreme Court in Babb v. Read, 5 Rawle, 151, where the members of a lodge of Odd Fellows were treated as partners, and a debt due by the society to one of its members postponed to that of third persons claiming on the same fund. But all these are cases of private associations for private emolument; or for benevolence confined exclusively to the associates, and in which none other had any participation. They possessed no general object, but were as much private concerns as any other union of individual capital for the exclusive advantage of the contributors. But the "Phœnix Hose Company" is not an association for the purpose of trade. There is no community of profit or loss; no termination of its existence by the death or withdrawal of any of its members; no taking of profits in severalty: Schuter v. Rapp, 5 Watts, 360. In short, as between the parties to it, it presents no feature in common with a partnership. It is then a private unincorporated association, for general purposes of public utility, and to be governed by the principles of law and equity applicable to such bodies: Livingston v. Lynch, 4 Johns. Ch. Rep. 578.

We are thus brought to the remaining inquiries in the cause, viz. whether the relief prayed for can be accorded to the plaintiffs, or whether on the hearing they have exhibited such an equity as calls for our interposition under their prayer for general relief.

That the special relief asked, cannot be accorded, follows from the ascertainment of the true character of the association. We are

asked to .treat it as a partnership, to pronounce for its dissolution—divide its assets among the members composing it at the time of the ejection of the plaintiffs—and in the interim, to place its property and funds in the hands of a receiver, and to prevent the introduction of new members into the association. Such an authority exists nowhere, on the application of a minority or even a majority of such an association. Its property is pledged to the objects for which it was intended and directed to be applied by the successive contributors, and cannot be diverted from them while those remain who are ready and willing to execute the public trust with which it has been clothed. Thus in Brownly v. Smith, 1 Simons, 8, it was held that a few of a large number of persons may · institute a suit in behalf of themselves and the rest, for relief against acts injurious to their common right, although the majority approve of those acts and disapprove of the institution of the suit. "The general principle of law," says Chancellor Kent in Livingston v. Lynch, 4 John. C. R. 594, "is, that, in such private associations, . the majority cannot bind the minority unless by special agreement." But, regarding this association in the aspect of a charity, nothing can be clearer than that a Court of Equity will not suffer its funds to be diverted to other uses than the donors intended (see 1 Bacon Abr. 588, tit. *Charitable Uses*, E.); and most certainly, they would not aid a minority in the diversion of the funds from the prescribed object, against the wishes of a majority of those charged with its execution. And this is precisely what we are required to do in this bill; for the complainants ask us to dissolve the association and apportion the funds among those charged to employ them for the general public good. The most sceptical as to the nature and extent of our equity jurisdiction in the premises, will hardly, we think, be disposed to doubt the accuracy of my conclusions, when I refuse to assist the complainants in the furtherance of such an object.

The argument before me has been chiefly directed against the regularity of the expulsion of the complainants, assigning such expulsion as a reason why the association should be dissolved, and its affairs wound up. If this association had been a partnership for a period not yet expressed by the terms of the articles, the exclusion of the plaintiffs as copartners would have undoubtedly formed a sufficient ground for a decree for dissolution and an account. This subject I had occasion to consider in the case of Gowen v. Jeffries, 2 Ashmead, 296. In that case the exclusion of a partner from all interference in the affairs of the firm, and the withholding

15 K 2

of the books from his inspection, were held adequate reasons for a dissolution of a partnership, long before the period limited by the articles for its continuance. The principles and authorities on which this decision was predicated, will be found on referring to the report. Not regarding this association as in any way analogous in its constitution to that of a partnership, the principles springing from that relation, which have been invoked, I do not regard as relevant. I do not, however, mean to say, that if an individual is unjustly and without reasonable cause deprived of his membership in such an association, he is without relief in a Court of Equity. If he has no relief there, he has it nowhere; for all that he could get in a Court of Law, if he could maintain an action, would be damages. Such a tribunal could not give him relief by reinstating him in his membership, and sustaining him in the enjoyment of the functions of which he had been deprived by the unjust acts of his co-associates. By mandamus I think he could get no assistance. That is a writ commanding execution of an act where otherwise justice would be obstructed or a charter neglected; issuing regularly only in cases relating to the public and the government, and is therefore termed a prerogative writ: 4 Bacon, tit. *Mandamus*, A. 498; Ib. C. 500; Comyn's Dig. vol. 5, tit. *Mandamus*, B. In The King *v.* The Marquis of Strafford, 3 T. R. 646, it was held that in cases of mere equitable right, the King's Bench could not interfere by mandamus, the remedy being in equity. Buller, in his opinion in this case, says, "It appears to me on the affidavits, that this is a trust, and therefore that the remedy is in equity. A party applying for a mandamus must make out a legal right; though, if he show such legal right, and there be also a remedy in equity, that is no answer to an application for a mandamus; for, when the court refuse to grant a mandamus because there is another specific remedy, they mean only a specific remedy at law." Com. *v.* Murray, 11 S. & R. 73, is full to the question that a mandamus will not lie.

If any doubt could exist as to our power to give relief to such a suitor by specifically compelling his restoration to the functions of a trustee, under general principles of equity, that must be greatly modified, if not entirely removed, when we have regard to the express power of "supervision and control of unincorporated associations and societies" given to this Court by the Act of 1836. These are words of broad extent, and some day will give rise to most interesting and extensive inquiries. I will not, however, now express any absolute opinion either on the extent of our powers

under the Act of 1836, or whether, under the circumstances of this case, enough has been disclosed to require us to decree the restoration of the plaintiffs to their functions as members. This relief has not been asked in the special relief prayed for in the bill, and is not such as should be granted under the general prayer. The rule on the subject is, that although, where the prayer does not extend to embrace all the relief to which the plaintiff may at the hearing show a right, the deficient relief may be supplied under the general prayer; yet such relief must be consistent with that specifically prayed, as well as with the case made by the bill; for the Court will not suffer a defendant to be taken by surprise, and permit a plaintiff to neglect and pass over the prayer he has made, and take another decree, even though it be according to the case made out by his bill: 1 Daniels, 489–90. Now, a specific prayer for the dissolution of an association, and an account and division of its assets, is hardly consistent with a decree for the restoration of the complainants to their functions as members, with the view that they should be assistants in the future execution of the trust. I will not, however, by a direct dismissal of the bill, deprive the plaintiffs of an opportunity of amending so as to ask the relief they *may be* entitled to. The case may therefore stand over, for the purpose of enabling them to amend, as well as respects the prayer for relief as by the introduction of new parties, if the objection on that ground which was suggested in the argument, is thought to possess any weight. The special injunction granted on the filing of the bill, *must be dissolved.*